IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNYLVANIA

MERECEDEZ LYNN, a minor, by and through   )
her parents and natural guardians, MELISSA LYNN  )
AND ROBERT LYNN, and MELISSA LYNN and  )
ROBERT LYNN, in their own right,      )
                        )   Civil Action No. 2:10-cv-01059
      Plaintiffs,        )
v.                        )
                        )   Judge Mark R. Hornak
YAMAHA GOLF-CAR COMPANY, FORMERLY  )
KNOWN AS YAMAHA GOLF COMPANY;   )
YAMAHA MOTOR MANUFACTURING    )
CORPORATION; YAMAHA MOTOR      )
MANUFACTURING CORPORATION OF     )
AMERICA; and YAMAHA MOTOR       )
MANUFACTURING CORPORATION, U.S.A.,   )
                        )
      Defendants.      )

## OPINION

**Mark R. Hornak, United States District Judge**

This is a products liability case seeking recovery for injuries allegedly caused by a defective golf car.

Mercedez Lynn and her parents, Robert and Melissa Lynn (collectively, the "Plaintiffs" or the "Lynns"), bring this civil action against Yamaha Golf-Car Company, Yamaha Motor Manufacturing Corporation, Yamaha Motor Manufacturing Corporation of America, and Yamaha Motor Manufacturing Corporation, U.S.A. (collectively, the "Defendants" or "Yamaha") for severe head injuries sustained by Mercedez Lynn when, as a passenger, she was thrown from a golf car manufactured by the Defendants. Now pending before the Court are Yamaha's Motion for Summary Judgment, ECF No. 32, and Motion to Preclude the Testimony

of Kristopher Seluga, M.S., P.E., Under Federal Rule of Evidence 702. ECF No. 34.  Having been fully briefed and argued, these matters are ripe for disposition.  For the reasons that follow, the Motion to Preclude the Testimony of Kristopher Seluga, M.S., P.E., Under Federal Rule of Evidence 702 is denied, and the Court will grant in part and deny in part the Motion for Summary Judgment.

## I.   **FACTUAL BACKGROUND**

On April 30, 2008, Plaintiff Mercedez Lynn, then thirteen (13) years old, was a passenger in a 1999 Yamaha G16A golf car, bearing manufacturer's serial number JN6-310453, which was being operated by her friend, Jackie Johnston, on a paved road in the Lynns' neighborhood. Defs.' Concise Statement of Material Facts ¶ 1.   The Yamaha golf car was purchased secondhand by Mercedez Lynn's father, Robert Lynn, on the side of the road from a private seller. Defs.' Concise Statement of Material Facts ¶¶ 4, 8.  Mr. Lynn did not receive the Yamaha Owner's/Operator's Manual that accompanied the vehicle on the initial purchase. *Id.*

Ms. Johnston, then operating a golf car for the first time, was also thirteen (13) years old at the time of the incident.  *Id.* at ¶¶ 1, 9.  Facing the public road from the Lynn property, the girls turned left out of the Lynns' driveway and traveled north on Sutherland Road.  Upon approaching a bend in the uphill portion of the road located at the top of Sutherland Road, Ms. Johnston began to make a left hand U-turn to return to the Lynn property. Pls.' Resp. to Defs.' Concise Statement of Material Facts ¶ 12.  In order to execute this maneuver, Ms. Johnston turned slightly right into the driveway of the residence located at 224 Sutherland Road. *Id.*  Ms. Johnston then turned the vehicle left with enough steering force to return south towards the Lynn property. *Id.*  At some point within the U-turn, Mercedez Lynn was thrown from the golf car, and her head struck the ground following her ejection.  As a result, Mercedez sustained serious

head injuries and is unable to recall the events leading up to the accident. Defs.' Concise Statement of Material Facts ¶ 2; Seluga Exp. Rep., ECF Nos. 43-7 and 45-4, at 3.

Shortly before the accident, as Jackie Johnston was approaching the driveway to make the U-turn, she saw Mercedez text messaging on her mobile telephone, which required the use of both of her hands. Defs.' Concise Statement of Material Facts ¶ 13; Johnston Dep. Tr. at 71:2-3. Ms. Johnston testified that, while in a seated position, Mercedez's feet were flat on the floor of the golf car just before Ms. Johnston maneuvered the golf car onto the driveway at 224 Sutherland Road. Pls.' Responsive Statement of Facts ¶ 13. There were no other eyewitnesses to the accident on Sutherland Road. Defs.' Concise Statement of Material Facts ¶ 2.

In pursuing their theories of liability and causation in this case, the Lynns retained the services of Kristopher Seluga, M.S., P.E., a licensed professional engineer in the State of Connecticut and an accredited traffic accident reconstructionist. ECF No. 45-2. As part of his investigation in this matter, Mr. Seluga reviewed: (1) the Police Report of April 30, 2008; (2) the transcript from Jackie Johnston's deposition; (3) photographs of the golf car and accident scene; (4) aerial photos of the accident scene; (5) various discovery documents, including the Owner's/Operator's Manual of the 1999 G16A golf car; (6) the relevant national safety standard for golf cars -- ANSI/NGCMA Z130.1-1993; and (7) the medical records of Mercedez Lynn containing height and weight measurements. Seluga Exp. Rep. at 9. Mr. Seluga also inspected, measured, and photographed the subject golf car and accident scene. *Id.* From this investigation, Mr. Seluga constructed several computer simulations recreating the accident to evaluate the effectiveness of the golf car's passenger hip restraint. *Id.*

This action was initially filed in the Court of Common Pleas of Westmoreland County, Pennsylvania, and the Defendants removed the case to this Court on diversity grounds, 28 U.S.C.

§ 1332(a). The Complaint, ECF No. 1-3, alleges that the 1999 Yamaha G16A golf car was defectively designed by the Defendants, specifically alleging that the hip restraint on the golf car acts as a fulcrum facilitating a passenger being ejected so as to make the golf car unreasonably dangerous, and that it lacked a passenger handhold in the area between the driver and passenger. Furthermore, the Plaintiffs allege that the golf car was defective due to a lack of adequate and proper warnings. Finally, the Plaintiffs also allege claims sounding in negligence against the Defendants.[1] The Defendants answered the Complaint on September 15, 2010. ECF Nos. 7, 8. The parties engaged in discovery, and, upon its completion, the Defendants filed the pending Motion for Summary Judgment on December 1, 2011. ECF No. 32. On the same day, the Defendants filed their Motion in Limine to Preclude the Testimony of Kristopher Seluga Pursuant to Federal Rule of Evidence 702. ECF No. 34.

## II.   JURISDICTION

The Court has subject matter jurisdiction over this action due to diversity of citizenship, and we will apply the substantive law of the Commonwealth of Pennsylvania and federal procedural law. 28 U.S.C. §§ 1332(a), 1652; *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

## III.   DISCUSSION

### *DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF KRISTOPHER SELUGA, M.S., P.E.*

The Defendants move the Court to preclude the testimony of Plaintiffs' expert, Kristopher Seluga, under Federal Rule of Evidence 702, which amounts to a challenge made under the Supreme Court's landmark decision in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579

---

[1] Plaintiffs proffered, both in their Response in Opposition to Defendants' Motion for Summary Judgment and at oral argument, that they would not proceed on the negligence claims even though they averred that there is sufficient evidence to support a finding in their favor on such claims. According to the Plaintiffs' counsel, this would have avoided any confusion among jurors when hearing evidence on the strict liability counts. For reasons explained at length, *infra*, the Court will not address the effect (if any) of that concession at this point.

(1993). In acting as a gatekeeper in a Rule 702 inquiry, the Court must screen purportedly scientific evidence and ensure that any and all such proffered evidence is both relevant and reliable. *Daubert*, 509 U.S. at 589, 597. This gatekeeping function also arises when an expert is offered to provide technical evidence related to the engineering field. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The Court's inquiry is one of flexibility wherein the focus rests solely on the principles and methods used by the expert, not on the conclusions drawn from them. *Daubert*, 509 U.S. at 594-95.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In determining the admissibility of expert testimony, courts have categorized the Rule 702 requirements as (1) the expert's qualifications, (2) the reliability of the expert's methods, and (3) the "fit" of the expert's methods to the facts of the case (i.e., whether the expert's methods are helpful to the fact finder). *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

1) **Qualifications**

In order to qualify as an expert witness, the witness must possess relevant specialized expertise. *Id.* at 405. While the Defendants initially spent considerable effort to discount the credibility of Kristopher Seluga by labeling him as a "paid" litigation expert, they maintain that they are not seeking to preclude his testimony based on any perceived lack of qualifications.

Defs.' Reply Br. at 7. Nevertheless, because the Defendants initially objected to Mr. Seluga's expertise, ECF No. 34 at 6-7, the Court will briefly examine his qualifications.

The Court has considerable latitude in determining whether a witness qualifies as an expert. *See In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir. 1994) (*Paoli II*). Our Court of Appeals has held that a broad range of knowledge, skills, and training may qualify a witness as an expert. *Id.* (citing *Paoli I*, 916 F.2d 829, 855 (3d Cir. 1990)). The *Paoli I* court thus held that the exclusion of a witness was not proper simply because an expert did not possess the education or training that the district court thought would be most appropriate. The Court is not presented with such a problem here.

Mr. Seluga obtained undergraduate- and graduate-level degrees from the Massachusetts Institute of Technology ("M.I.T."). Seluga Curriculum Vitae, ECF No. 45-2. While at M.I.T., Seluga was named to the Tau Beta Pi Engineering Honor Society and the Pi Tau Mechanical Engineering Honor Society and was named an M.I.T. Martin Fellow. *Id.* Seluga is a licensed professional engineer in the State of Connecticut and an accredited traffic accident reconstructionist. *Id.* He is a member of various industrial trade groups, namely the American Society of Mechanical Engineering, the Society of Automotive Engineers, the Human Factors and Ergonomics Society, the Institute of Transportation Engineers, and the National Association of Professional Accident Reconstruction Specialists. *Id.* Mr. Seluga also serves on the committee responsible for promulgating the national safety standards for golf cars on behalf of the American National Standards Institute ("ANSI") and the National Golf Car Manufacturers Association, Inc. ("NGCMA"). Seluga Dep. Tr. at 46-48. In addition to developing vehicle dynamic simulation programs for accident reconstruction applications, Mr. Seluga also purports to have experience with biomechanical simulation software and dynamic testing and analysis.

Seluga Curriculum Vitae, ECF No. 45-2. Finally, Mr. Seluga has published articles on various aspects of golf cars and other slow-moving vehicles. *Id.* In fact, one of Seluga's writings examines the prevention of child ejections from golf cars and personal transport vehicles. *See* ECF No. 45-3, Kristopher Seluga & Timothy Long, *Analysis and Prevention of Child Ejections from Golf Cars and Personal Transport Vehicles*, 21st International Conference on the Enhanced Safety of Vehicles (ESV), Paper No. 09-0186 (June 2009).

Given Mr. Seluga's education, activity within several relevant trade groups, experience with computer simulations in the areas of mechanical and biomechanical engineering, his receipt of awards and membership into honor societies in the industry, and publications on topics facially related to the matter at hand, the Court finds that Kristopher Seluga is a qualified expert for purposes of satisfying Rule 702. Thus, as a biomechanical engineer, Seluga is qualified to render an opinion in this case as to the general causation of the force sustained by Mercedez Lynn, but not specific injury causation that would require the identification and diagnosis of a medical condition. *Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 334 (M.D. Pa. 2009) (citing *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343, 1377 (M.D. Ga. 2007)) (internal citations omitted).

2) **Reliability**

Under *Daubert* and its progeny, expert testimony is admissible so long as the process or technique that the expert relied upon in formulating an opinion is reliable. *Daubert*, 509 U.S. at 589; *see also Paoli II*, 35 F.3d at 742. In other words, the expert must have good grounds for the opinion, which must be based on the "methods and procedures of science" instead of a "subjective belief or mere conjecture." *Daubert*, 509 U.S. at 590. Defendants do not contest, and at oral argument conceded to, the inherent reliability of the computer programs Mr. Seluga

7

uses to conduct computer simulations, specifically Articulated Total Body ("ATB") and the Generator of Body Data ("GEBOD").[2] Instead, Defendants argue that the data Mr. Seluga used in his computer simulation lacked evidentiary support, and thus his expert testimony should be excluded. Specifically, Defendants point to Mr. Seluga's "admission" that, when completing the computer model used to support his conclusions, he used an assumed seating position for Mercedez Lynn, with her back against the seatback and feet on the floor of the golf car. This, according to Yamaha, is not supported by the record. Defendants also claim that there is no evidence, through deposition testimony or otherwise, to support (1) the speed and angle at which Jackie Johnston entered and exited the driveway in executing the U-turn, or (2) precisely how, when, or where Mercedez came out of the golf car. Defs.' Reply Br. at 9.[3] Because of these alleged shortfalls in the record, Defendants argue that Seluga's testimony should be precluded in its entirety as unreliable.

Courts treat challenges to the data used in computer simulations in different ways. Typically, a court will not strike an expert's testimony where the simulation program used by the expert itself passes the *Daubert* test but an objection remains as to the data inputs utilized by the

---

[2] ATB and GEBOD are biomechanical simulation programs used by Seluga in conducting computer simulations to create, or recreate as the case may be, certain events given a measured data set used as variables in the simulation. In one of Mr. Seluga's peer-reviewed articles, he describes ATB as a program that "models the dynamic response of systems of connected or free bodies such as the human body during a dynamic event." Kristopher Seluga & Timothy Long, *Analysis and Prevention of Child Ejections from Golf Cars and Personal Transport Vehicles*, at 4, 21st International Conference on the Enhanced Safety of Vehicles (ESV), Paper No. 09-0186 (June 2009). GEBOD is a companion program to ATB that generates a model of the human body for use in ATB simulations. *Id.* Further, ATB has been used to study ejections during motor vehicle accidents. *Id.* Other courts have noted the use of ATB. *See Reali v. Mazda Motor of America, Inc.*, 106 F. Supp. 2d 75, 77 (D.Me. 2000); *Melberg v. Plains Marketing, L.P.*, 332 F. Supp. 2d 1253, 1259 (D. N.D. 2004). Neither of these courts have held that the computer program, in and of itself, is unreliable for purposes of *Daubert*. Together, ATB and GEBOD have been found to be part of a reliable methodology by at least one court in this circuit. *See Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 334-35 (M.D. Pa. 2009).

[3] Of course, the natural extension of Defendants' argument is that such exclusion would be required in any case where there is no eyewitness, or photographic, evidence possessing the level of exactitude Defendants posit. Putting aside for the moment the breadth of such a position, for the reasons which follow, the record here does provide the requisite level of support for Seluga's opinions.

expert. *See Burke*, 617 F. Supp. 2d at 334-35; *In re Yamaha Motor Corp. Rhino ATV Prods. Liability Litigation*, 816 F. Supp. 2d 442, 461-62 (W.D. Ky. 2011) (citing *Shadow Lake Management Co. Inc. v. Landmark American Ins. Co.,* 2008 WL 2510121 (E.D. La. June 17, 2008)). According to the *Shadow Lake Management* court, where a computer program utilized by an expert is commonly used and is sufficiently reliable, any concerns about the factual basis of an expert's reports and opinions are best resolved by "vigorous cross-examination and the presentation of contrary evidence."[4] *In re Yamaha Motor Corp. Rhino ATV Prods. Liability Litigation*, 816 F. Supp. 2d at 462. Any inaccuracy in the data goes to the weight of the evidence, not its admissibility. *Burke*, 617 F. Supp. 2d at 335, *see also id.* (citing *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730 (N.D. Ill. 2005). If this case were to proceed to a trial, counsel for the Defendants will have the opportunity to attempt to discredit Seluga's conclusions in front of a jury on cross-examination. *See Montgomery v. Mitsubishi Motors Corp.*, 2:04-cv-03234, 2006 WL 1310657 (E.D. Pa. May 12, 2006), *see also Burke*, 617 F. Supp. 2d. at 335. In *Montgomery*, noting the defendants' argument that the expert's testimony was unsupported by the record evidence in that case, and thus was unreliable based upon the accuracy of the data (primarily because the variable in the computer simulation representing the vehicle was a different model vehicle than the actual automobile in the accident), Judge Pratter concluded that the accuracy of the data was an issue for the jury to consider and that the expert's report or testimony should not be excluded on the basis of unreliability. *Montgomery*, 2006 WL 1310656, at *7.

However, other courts, as Defendants correctly note, have held that preclusion of an expert's testimony is proper when necessary to screen inaccurate data used in computer

---

[4] The Court's searching review of the transcript of Mr. Seluga's deposition reveals that defense counsel appears more than up to this task, and that Mr. Seluga has the ability to likewise engage in the parry and thrust of such an exchange.

modeling. *See Reali v. Mazda Motor of America*, 106 F. Supp. 2d 75 (D. Maine 2000). In *Reali*, the defendants filed motions *in limine*, similar to the pending motion before this Court, to exclude expert testimony. In granting the motions, Judge Hornby concluded that a certain data point – Delta V, which measures the change in the velocity of one object when struck by another – was unreliable because the expert derived the number in what amounted to "eye-balling accident photographs." *Id.* at 77.

Defendants argue that the assumptions Seluga made in constructing his computer model of the accident in this case amount to subjective beliefs, observations, and methodologies that are prohibited under Fed. R. Evid. 702 and *Daubert*. *See Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781 (3d Cir. 2009); *Simmons v. Ford Motor Co., Inc.*, 132 F. App'x 950 (3d Cir. 2005). In *Simmons*, the plaintiff brought a products liability action against a car manufacturer for harm she sustained when her Lincoln Navigator spontaneously shifted out of park and struck her as she was exiting the vehicle. To prove her theory of liability (that the park gear became disengaged and did not hold the proper vehicle position), the plaintiff relied upon an expert whose opinions were excluded by the trial court. The Third Circuit held that the district court did not abuse its discretion by excluding the expert witness, and held that the expert's testimony was unreliable because: (1) he could not identify why the car disengaged from park; and (2) he could not replicate the vehicle movement that caused the plaintiff's injuries. *Simmons*, 132 F. App'x at 953. The Court noted that the expert arrived at two theories regarding the cause of the vehicle's movement simply because he could not identify any other causes. *Id.*

Such rough-and-ready estimates or mere guesswork as seen in *Reali* and *Simmons* are not present here. Mr. Seluga personally inspected the Lynns' golf car and took photographs of the accident scene. All of the record evidence indicates that Seluga attempted to replicate the

10

accident within the confines of the known facts.[5]  Seluga test drove the 1999 Yamaha G16A golf car in question, where he measured, among other things, the speed, minimum turning radius, and the peak lateral car acceleration of the Yamaha golf car.  Seluga Exp. Rep. at 11.  He also took measurements of Sutherland Road and the driveway located at 224 Sutherland Road.  *Id.*  Defendants argue that Seluga's testimony is unreliable and label it as "factually unsupported," primarily based on the deposition testimony of Jackie Johnston, regarding the golf car's speed, angle, and steering force at the time of the accident.  However, the Court's discussion below regarding the "fit" to the facts of this case demonstrates that there is factual support for Seluga's methods, expert report, and testimony.  Mr. Seluga made these assumptions within known values based on the measurements previously taken in his investigation and available record evidence as set forth below.  While the Court acknowledges these arguments made by Yamaha, they go to the weight of the evidence and the credibility of Seluga and are best made to a jury.

While the Court need not engage in a reliability analysis of Seluga's methods because of the Defendants' concession regarding the inherent reliability of ATB and GEBOD (and our conclusion that any objection to the data that Seluga used in those computer programs can be properly addressed during cross-examination), it may also consider, among other things:  (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationships of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.  *Paoli II*, 35 F.3d at 742 n.8.  This list is non-exclusive;

---

[5] The Court's discussion of *Meadows*, *infra*, demonstrates the importance of Seluga's replication of the accident conditions and examination of the actual golf car in this case.

"each factor need not be applied in every case." *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. at 152). In addition, courts have acknowledged that these factors do not apply to the reliability of computer simulations the same way they do to traditional expert testimony. *In re Yamaha Motor Corp. Rhino ATV Prods. Liability Litigation*, 816 F. Supp. 2d at 461 (citing *Livingston v. Isuzu Motors, Ltd.*, 910 F. Supp. 1473 (D. Mont. 1995)).

Based on the factors listed above, the Court concludes that Seluga's opinions are reliable and were based on scientific methods and procedures instead of merely subjective beliefs or unsupported speculation. Mr. Seluga's methodology consists of a testable hypothesis. Using the measurements gathered in the field, Seluga is able to test his hypothesis that the golf car's hip restraint acted as a fulcrum in this case by inputting directly that data into his computer modeling, or, if the value is unknown with certainty, within known parameters based on measurements. This methodology has been subject to peer review, as is evidenced by Seluga's scholarly work in numerous publications related to the field of biomechanics. Mr. Seluga's scholarship also shows that his methodology has been put to non-judicial uses. Additionally, Mr. Seluga's expertise in the area of biomechanics and accident reconstruction (specifically, ejection from slow-moving vehicles such as golf cars) enhances the reliability of the computer modeling used in this case. The Court also notes, in cases cited by the parties in their briefing materials, that the use of ATB and GEBOD, in addition to computer simulation of vehicular accidents generally, weighs in favor of the general acceptance of this methodology.[6]

---

[6] The Defendants argue that because Seluga's proposed alternative design was not adopted by the ANSI committee in developing its safety standards, his testimony is unreliable because it is not generally accepted. However, this cuts to the conclusions reached by Seluga in his testing and not to the methodology itself in reaching such conclusions. As our inquiry focuses upon the methodology, this argument does not carry the day at this stage of the case.

3) **Fit**

Citing *Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781 (3d Cir. 2009), Defendants argue that Seluga's report and testimony do not fit the facts of this case. Therefore, according to Yamaha, *Daubert* requires this Court to preclude Seluga's testimony at trial. We disagree. Rule 702 requires that an expert's testimony assist the trier of fact in resolving a factual dispute. *Daubert*, 509 U.S. at 591. In other words, an expert's testimony passes the "fit" test if there is a clear, valid scientific connection between the expert's opinion and the particular disputed factual issues in the case. *Meadows*, 306 F. App'x at 790; *Paoli II*, 35 F.3d at 742-43. Even if an expert's testimony is based on considered scientific or technical knowledge, the testimony will be excluded if it is not knowledge related to the purposes of, or pertinent inquiry to, the case. *Paoli II*, 35 F.3d at 742-43. Additionally, an expert's opinion must be supported by some factual foundation to satisfy the "fit" requirement. *Meadows*, 306 F. App'x at 791 (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).

This case is not at all as similar to *Meadows* as Defendants would have it. In *Meadows*, the plaintiff mineworker, while manually pressurizing a mine longwall shield in order to raise the canopy of the shield to the roof of the mine as part of a repair and refurbishment project, was struck in the face by a shut-off valve fitting when it pulled loose from the valve assembly housing, causing plaintiff to lose the use of his right eye. The mineworker and his wife hired an expert to investigate the valve malfunction and testify as to liability and causation. The Meadows' expert testified that, using general principles of physics, a pressure spike exceeding 100,000 psi occurred in the hydraulic fluid within the system when the ram bar used to manually pressurize the longwall shield was in the down position. Our Court of Appeals upheld the trial court's exclusion of the expert's testimony because it was unreliable and the expert's testing of

the valves did not fit the facts of the case. *Meadows*, 306 F. App'x at 791. Specifically as to the "fit" requirement, the Third Circuit noted that the expert did not examine the actual alleged defective product, did not replicate the conditions of the longwall shield at the time of the accident (specifically, the hose assembly), and did not subject the valves to the pressure spike he alleged had occurred. *Id.* at 790. Instead, the expert, using three (3) ball valves he purchased from the lot that was the source of the allegedly defective valves, connected the valves to a metal pipe filled with water and slowly increased the pressure with an air pump. According to his tests, the valves failed at approximately 13,000 to 15,000 psi because of a leak in the valve. The *Meadows* court, in concluding that the district court did not abuse its discretion by excluding the expert's testimony, noted that given the dissimilar nature of the testing methods compared to the actual valve assembly and the incongruence of the test results to the actual results found in the mine,[7] the expert's testimony would not assist the jury in determining what caused the accident. *Id.* at 791.

The Court concludes that Mr. Seluga's testing methods, expert report, and deposition testimony sufficiently fit the facts of this case. Here, as we have already indicated above, Mr. Seluga attempted to replicate the accident in this case; he went to the scene of the accident, took photographs, and, through testing the Lynns' golf car within the purported course taken by Mercedez and Jackie on April 30, 2008, compiled measurements relative to the actual scene and the involved golf car. In order to prepare his report and conduct a computer simulation that appropriately resembled the accident in this case, Mr. Seluga reviewed numerous documents, including the police report of the accident, the transcript of Jackie Johnston's deposition

---

[7] For example, the record evidence in *Meadows* showed that the apparatus on which the plaintiff was working did not contain a ram bar or a base jack lift, which is the essential equipment that the *Meadows* expert relied upon in reaching his conclusions.

testimony, the Owner's/Operator's Manual for the 1999 Yamaha G16A, the relevant ANSI/NGCMA standards, and Mercedez Lynn's medical records. Seluga Exp. Rep. at 9.

According to Yamaha, Mr. Seluga made several important assumptions in his computer modeling that do not "fit" the facts of the case, which nonetheless requires this Court to exclude Seluga's expert testimony. Defendants would have the Court exclude Seluga's report and testimony based on its characterization of certain heated exchanges between its counsel and Seluga at a deposition with regard to assumptions made in the data inputs for the computer modeling. The record reveals that on two occasions in which Seluga was vigorously challenged by defense counsel, Seluga clarified previous statements related to the support for variables used in his computer simulation, namely: (1) the position of Mercedez Lynn in the golf car at the time of the accident; and (2) the speed with which Jackie Johnston was operating the golf car before, during, and after the U-turn. Mr. Seluga initially stated that Ms. Johnston "testified that, you know, [Mercedez] was seated in the passenger side seat." Seluga Dep. Tr. at 119:24-25. In response to defense counsel's suggestion that there was no testimony about *how* Mercedez was seated at any time prior to the accident, Mr. Seluga agreed. *Id.* at 120:8. However, later in the deposition, Mr. Seluga noted that Jackie Johnston testified that she saw Mercedez's feet on the floor of the golf car. *Id.* at 154:12-13. Each of these statements is supported by the deposition testimony of Ms. Johnston. While she testified that she did not know exactly where Mercedez was positioned on the seat, or if Mercedez's back was against the backrest, Ms. Johnston said she was unaware of what had happened until she noticed that "[Mercedez] wasn't *sitting* next to me when [she] looked over." Johnston Dep. Tr. at 71:2 (emphasis added). Therefore, given Ms. Johnston's testimony that she saw that Mercedez was in fact seated and with her feet on the floor, and that there is no testimony, or other evidence on record, which suggests that Mercedez

15

was in a position that otherwise makes Seluga's data inputs so inaccurate so as to make his testimony not "fit" the facts of the case, there is sufficient record evidence supporting this element of "fit."

Moreover, the Court finds that Seluga's testimony with respect to the speed of the golf car competently fits the relevant facts of the case. Jackie Johnston testified that she pressed the gas pedal to the floor as she traveled north on Sutherland Road. Johnston Dep. Tr. at 71:4-7. She also testified that she let off the gas pedal as she approached the downhill section of the driveway, *id.* at 62:18-22, and applied the brake when she started going downhill in the driveway. *Id.* at 117:9-14. Seluga, after initially testifying that he based his estimation that the golf car was traveling "near 13 miles an hour" on Johnston's testimony, in which she claimed to have the gas pedal fully depressed while entering the turn, did admit that "she would have been slowing down" in the driveway. Seluga Dep. Tr. at 104-05. However, Seluga then clarified that the input speed decreased during the two-second simulation from a starting speed of thirteen (13) miles per hour to almost nine (9) miles per hour at the end of the simulation. This, according to Seluga, is supported by the testimony and his independent testing, and shows that Mercedez could have been ejected even when Ms. Johnston let off the gas at the end of her travels. Seluga Dep. Tr. at 150. The Court notes that to the extent there exists an inconsistency in Seluga's testimony, either in his previous statements or assumptions in rendering his opinion, Defendants may, of course, call the jury's attention to those matters on cross-examination. However, because Seluga's testimony considered as a whole fits the facts of this case and is otherwise reliable, the Defendants' Motion to Preclude Seluga's testimony is denied.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### LEGAL STANDARD

The purpose of summary judgment is "to dispose of factually unsupported claims and defenses." *Omnipoint Comm. Enter., L.P. v. Newtown Tp.*, 219 F.3d 240, 242 (3d Cir. 2000). Summary judgment is appropriately granted in favor of the moving party if the movant can demonstrate that no genuine issue of material fact exists, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Accordingly, to survive a motion for summary judgment, the *non-movant* must establish that there is indeed a genuine issue of material fact, which requires the action to proceed to a trier of fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (emphasis added). An issue is "genuine" only if it would prevent a rational factfinder, when viewing the record as a whole, from granting judgment for the moving party. *See id.* at 586. Regarding materiality, the substantive law identifies which facts are "material," meaning only those materially and disputed facts that "might affect the outcome of the suit under the governing law will preclude an entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Within the framework of Federal Rule of Civil Procedure 56, the moving party must first demonstrate the absence of a genuine issue of material fact by citing to relevant portions of the record, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, and interrogatory answers." Fed. R. Civ. P. 56(c)(1). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, a court is not confined to the cited materials and may consider all materials in the record. Fed. R. Civ. P. 56(c)(3). If the movant meets his burden, the non-movant must then point to evidence supporting the existence of a genuine issue of material fact.

*El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007).   But "[t]he non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." *Id.* (citing *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).   The court reviews all evidence in the light most favorable to the non-moving party and draws all justifiable inferences in the non-movants favor.   *Omnipoint Comm. Enter., L.P.*, 219 F.3d at 242 (citing *Anderson*, 477 U.S. at 255); *Matreale v. N.J. Dept. of Military & Veterans Affairs*, 487 F.3d 150, 152 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, (2000) (citing cases); *Equimark Commercial Finance Co. v. C.I.T. Financial Servs. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

*ANALYSIS*

Yamaha moves for summary judgment on Plaintiff's' strict liability claims on various grounds,[8] primarily arguing that summary judgment is proper because:  (1) Mercedez Lynn and Jackie Johnston were not intended users of the golf car, nor were they operating the vehicle in accordance with its intended use, as required to maintain a strict liability claim; (2) the Plaintiffs have failed to demonstrate that an alternative design would have prevented this accident from occurring; and (3) the Plaintiffs have failed to establish that (a) adequate warnings would have

---

[8] Yamaha also bases its Motion for Summary Judgment on the failure of proof that would result from excluding Mr. Seluga's expert testimony.  Given the Court's denial of the Motion to Exclude Mr. Seluga's testimony, the Motion for Summary Judgment on such grounds is denied.

prevented this accident, and (b) the inadequate warnings, if any, caused the minor Plaintiff's injuries.[9]

*THE CURRENT STATE OF PENNSYLVANIA PRODUCTS LIABILITY LAW*

The substantive law of the Commonwealth of Pennsylvania supplies the rule of decision for the disposition of the Lynns' strict products liability claims. 28 U.S.C. § 1652; *see Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

As this Court has recently observed, Pennsylvania products liability law may be fairly seen as being in a state of profound uncertainty. *See Sansom v. Crown Equipment Corp.*, 2:10-cv-0958, 2012 WL 3027989 (W.D. Pa. July 24, 2012). The current state of the law in this area provides little clarity to consumers or manufacturers, or their counsel, as to their obligations and rights under the products liability law of this Commonwealth. Notwithstanding this reality, the Pennsylvania Supreme Court, in the face of several recent opportunities to do so, has elected to not yet rule on whether the more recently completed Restatement (Third) of Torts now provides the controlling analysis for products liability claims, rather than the analysis under the Restatement (Second) of Torts.[10] *See, e.g., Schmidt v. Boardman Co.*, 11 A.3d 924, 940-41 (Pa.

---

[9] Yamaha also moves for summary judgment on the negligence claims advanced by the Lynns because, according to Yamaha, they fail to present any evidentiary support to show that: (1) Yamaha breached a duty it owed to the Lynns; and (2) allegedly unreasonable conduct, if any, was the proximate cause of Mercedez Lynn's injuries. Defs.' Br. Supp. Mot. Summ. J. at 13-21. In response to Yamaha's Motion for Summary Judgment, the Plaintiffs maintain that there is enough evidence to bring a negligence claim without any further factual support whatsoever. Pls.' Opp'n Mot. Summ. J. at 15. They also previously stated, however, that they would elect not to proceed with the negligence claims against the Defendants. *Id.* In light of the Plaintiffs' most recent filing, a Motion to Establish Restatement Torts (Second) § 402A as the Applicable Law in the Present Case or, in the Alternative, Motion to Reopen Discovery and Pleadings, ECF No. 117, the Court will defer ruling on the Motion for Summary Judgment as to the negligence claims pending disposition of that Motion.

[10] In the absence of a definitive adoption of the Restatement (Third) by the Pennsylvania Supreme Court, one might suppose that the Restatement (Second) applies by default. However, the multiple opinions in *Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003), *Schmidt v. Boardman Co.*, 11 A.3d 924 (Pa. 2011), and *Beard v. Johnson and Johnson, Inc.*, 41 A.3d 823 (Pa. 2012), belie any such easy analysis, given the *Phillips* and *Beard* courts' recognition of the fundamental doctrinal uncertainty in this area of the law, and that court's willingness in *Schmidt* to tack onto

2011) (acknowledging that "foundational problems" exist in Pennsylvania products liability law based upon the Restatement (Second) of Torts, but noting that the case before the Court was not selected to address these "foundational concerns"); *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1012 (Pa. 2003) (Saylor, J., joined by Castille, J. and Eakin, J., concurring) (advocating adoption of the Restatement (Third) and opining that it represents "a synthesis of law derived from a reasoned, mainstream, modern consensus").   The question of which Restatement governs is important because the Restatement (Third) differs notably from its predecessor by integrating certain negligence-based foreseeability concepts into its analysis.  Restatement (Third) of Torts, Products Liability § 1 cmt. a.  In contrast, Pennsylvania's products liability structure under the Restatement (Second) forbids a court to consider negligence principles.  *Carrecter v. Colson Equip. Co.*, 499 A.2d 326, 330 (Pa. Super. Ct. 1985) (quoting *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 900 (Pa. 1975)).

The Pennsylvania Supreme Court has also acknowledged that the over forty years of case law interpreting the Restatement (Second) of Torts, beginning with *Webb v. Zern*, 220 A. 2d 853 (Pa. 1966), and enhanced by *Azzarello v. Black Brothers Co.*, 391 A.2d 1020 (Pa. 1978), has culminated in a products liability schema that is "almost unfathomable." *Schmidt*, 11 A.3d at 940 (citing to James A. Henderson, Jr. & Aaron D. Twerski, *Achieving Consensus on Defective Product Design,* 83 Cornell L. Rev. 867, 897 (1998)).  *See also Beard v. Johnson and Johnson, Inc.*, 41 A.3d 823, 836 (Pa. 2012) (recognizing the "continuing state of disrepair in the area of Pennsylvania strict-liability design defect law").

---

more traditional Restatement (Second) analysis legal principles normally applied under the Restatement (Third). 841 A.2d at 1012 (Saylor, J., concurring); 11 A.3d at 940; *Beard*, 41 A.3d at 836.  Further, for at least nine (9) years, at least some members of that court have held the view that the strict liability doctrine in Pennsylvania is so "deficient" that an "overhaul" is necessary.  *Phillips*, 841 A.2d at 1018 (Saylor, J. concurring).  Given that, this Court cannot conclude that there is any current "default position" under that court's holdings.

Then there are the Third Circuit's decisions holding that district courts in our circuit must apply the Restatement (Third) to design defect claims arising under Pennsylvania law, absent a clear and contrary holding from the Pennsylvania Supreme Court. *See Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1541 (2012); *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 53-54 (3d Cir. 2009), *cert. denied*, 130 S.Ct. 553 (2009). Of course, when the Pennsylvania Supreme Court speaks on a particular point of Pennsylvania law, its "pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). When the Pennsylvania Supreme Court is silent regarding a state law issue, a federal court must predict how that Court would resolve that issue. *See Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010). A federal court must look to the holdings of the state's lower courts and accord their decisions due deference. *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir. 1996). When the federal court issuing the prediction is our Court of Appeals, the district courts in this Circuit are to apply its predictive holding to legal questions arising under that particular state law "unless the state supreme court issues a contrary decision." *Largoza v. Gen. Elec. Co.*, 538 F. Supp. 1164, 1166 (E.D. Pa. 1982).[11]

The Third Circuit made its prediction regarding the path of Pennsylvania products liability law in *Berrier v. Simplicity Mfg., Inc.* 563 F.3d at 53-54. The *Berrier* court was presented with the issue of whether, under Pennsylvania law, the Restatement (Second) or

---

[11] As noted below, note 12 *infra*, several of our sister federal district courts in this Circuit have held that post-*Berrier* and *Covell*, the Pennsylvania Supreme Court has spoken with the requisite level of clarity and persuasion such that the *Berrier* and *Covell* predictions should now be viewed as prematurely inaccurate. While this Court certainly respects the thorough and searching analyses that has led those courts to that conclusion, this Court respectfully disagrees, and concludes that in the face of the various holdings and reasoning of our state's supreme court in its most recent series of strict liability cases, including in *Beard*, 41 A.3d 823 (Pa. 2012), the level of clarity and persuasion from that court that would require this Court to sidestep *Covell* and *Berrier* has not arrived.

21

(Third) of Torts governed the potential imposition of liability on distributors for injuries to unintended users of their products. *Id.* The unintended user, or "bystander," in that case was a minor child who suffered injuries when her leg was caught under a riding lawn mower. *Id.* at 41. The Third Circuit concluded, after a review of Pennsylvania appellate decisions regarding bystander liability, particularly Justice Saylor's concurrence in *Phillips v. Cricket Lighters,* 841 A.2d 1000 (Pa. 2003), that the Pennsylvania Supreme Court would adopt Sections 1 and 2 of the Restatement (Third) of Torts to determine whether an injured, unintended consumer could recover from the product's distributor. *Id.* at 49-54. Accordingly, since the district court limited its summary judgment analysis to intended users under the Restatement (Second), the *Berrier* court remanded the case so that the district court could consider issues as to a reasonably foreseeable user pursuant to the Restatement (Third). *See id.* at 60-61. The Third Circuit thus directed district courts in this Circuit to apply the Restatement (Third) of Torts in cases that require the application of Pennsylvania products liability law. *See id.* at 57.

Nearly two years later, the Pennsylvania Supreme Court took note of the prevailing difficulties in the products liability arena. *See Schmidt v. Boardman Co.,* 11 A.3d 924, 940 (Pa. 2011). In *Schmidt,* Justice Saylor pointed to the need to settle the inconsistencies in Pennsylvania products liability law, but declined to rule directly on the issue by concluding "[t]his case was not selected to address the foundational concerns, and, accordingly, the pathways to global resolution are not developed in significant detail in the briefing." *Id.* at 941. Therefore, the *Schmidt* court could "do little more . . . than to remark that difficulties persist and to proceed to address the *specific questions presented* with them . . . in mind." *Id.* (emphasis added). The *Schmidt* court also took note of the Third Circuit's prediction in *Berrier,* but stated

that the "present status quo in Pennsylvania entails the continued application of Section 402A of the Restatement Second . . . ." *Id.*

Six months after *Schmidt* was decided, when faced with the question as to whether a district court properly admitted certain evidence and instructed a jury pursuant to the Restatement (Third) of Torts in a diversity suit involving the alleged defective design of a bicycle helmet, the Third Circuit concluded that the "state of [Pennsylvania products liability law] is no different now than it was when we decided *Berrier*." *Covell v. Bell Sports, Inc.*, 651 F.3d 357, 360 (3d Cir. 2011). The *Covell* court reiterated that "federal district courts applying Pennsylvania law to products liability cases should look to sections 1 and 2 of the Restatement (Third) of Torts." *Id.* at 359. Accordingly, the Third Circuit affirmed the district court's decision to utilize the Restatement (Third) and, in doing so, instructed district courts to rely upon the Restatement (Third) when analyzing issues relating to allegedly defective products under Pennsylvania law. *See id.* at 358, 363.[12]

---

[12] After the Third Circuit's decision in *Berrier*, but before Judge Aldisert's opinion for that court in *Covell*, district courts in this circuit were split on whether to apply the Restatement (Second) or (Third) of Torts and the principles set forth therein. *Compare Covell v. Bell Sports, Inc.*, No. 9–2470, 2010 WL 4783043, at *4 (E.D. Pa. Sept. 8, 2010) (Diamond, J.) (applying *Berrier*); *Hoffman*, 694 F. Supp. 2d 359, 365 (E.D. Pa. 2010) (Tucker, J.) (same); *Richetta v. Stanely Fastening Sys., L.P.*, 661 F. Supp. 2d 500, 507 (E.D. Pa. 2009) (Golden, J.) (same), *with Thompson v. Med–Mizer, Inc.*, No. 10–cv–2058, 2011 WL 1085621, at *7 (E.D. Pa. Mar. 21, 2011) (Gardner, J.) (court not bound by *Berrier*); *Sweitzer v. Oxmaster, Inc.*, No. 09–5606, 2010 WL 5257226, at *5 (E.D. Pa. Dec. 23, 2010) (Pratter, J.) (same); *Milesco v. Norfolk Southern Corp.*, No. 1:09–CV–1233, 2010 WL 55331, at *3, *6 (M.D. Pa. Jan. 5, 2010) (Jones, III, J.) (rejecting application of *Berrier*); *Durkot v. Tesco Equip., LLC*, 654 F. Supp. 2d (E.D. Pa. 2009) (Hart, M.J.) (same). Even since the Third Circuit's decision in *Covell*, a division remains. *Compare Giehl v. Terex Utilities*, No. Civ. A. 3:12–0083, 2012 WL 1183719, at *9 (M.D. Pa. Apr. 9, 2012) (Caputo, J.) (applying *Covell*); *Spowal v. ITW Food Equip. Group LLC*, C.A. 10-187, ECF No. 52 (W.D. Pa. Apr. 4, 2012) (Cohill, J.) (same); *Shuman v. Remtron, Inc.*, No. 04–cv–00003, 2012 WL 315445, at *9, n.10 (M.D. Pa. Feb. 1, 2012) (Smyser, M.J.) (adopting *Covell*), *with Carpenter v. Shu's Bees, Inc.*, No. Civ. A. 10–0734, 2012 WL 2740896, at *1 (E.D. Pa. July 9, 2012) (Perkins, M.J.) (court not bound by *Covell*); *Sikkelee v. Precision Automotive Corp.*, No. 4:07–cv–00886, 2012 WL 2552243, at *9 (M.D. Pa. July 3, 2012) (Jones, III, J.) (same). Other courts within the circuit, while noting the unclear state of the law, have not been required to rule definitively on the question. *See Westfield Ins. v. Detroit Diesel Corp.*, No. 3:10–cv–100, 2012 WL 1611311, at *7 (W.D. Pa. May 8, 2012) (Gibson, J.); *Davis v. Lowe's Home Centers, Inc.*, No. Civ. A. 09–5367, 2011 WL 3862192, at *2, n.2 (E.D. Pa. Sept. 1, 2011) (Hey, M.J.); *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.*, No. Civ. A. 07–4029, 2011 WL 3740472, at *1 (E.D. Pa. Aug. 25, 2011) (Schiller, J.). This Court believes, as a matter of judicial hierarchy, that it is obligated to rely upon the Third Circuit decisions of *Berrier* and *Covell* and apply the Restatement (Third), and recently so ruled on this

Since *Covell*, the Pennsylvania Supreme Court had the opportunity to conclude this judicial volleying in *Beard v. Johnson and Johnson, Inc.* 41 A.3d 823 (Pa. 2012). Writing for the *Beard* court in March 2012, Justice Saylor again recognized the "continuing state of disrepair in Pennsylvania strict-liability design defect law." *Id.* at 836. However, notably absent in *Beard* is any determination, holding or even persuasive *dicta* clearly and directly contrary to *Covell* regarding the applicable law governing Pennsylvania products liability cases. *See, generally, id.* The *Beard* appellee did invite the court to adopt the Restatement (Third) of Torts, but the court did not accept or decline that invitation. *Id.* Thus, given that the Pennsylvania Supreme Court in *Beard* did not affirmatively disavow the premise of the *Covell* decision, along with the principle that the Third Circuit's predictions regarding Pennsylvania state law are binding on this Court absent a decision of the Pennsylvania Supreme Court expressly to the contrary, this Court must and will apply the Third Circuit's *Covell* prediction and rely upon Sections 1 and 2 of the Restatement (Third) of Torts here.

RESTATEMENT (THIRD) OF TORTS: STRICT LIABILITY

Under the Restatement (Third) of Torts, strict liability attaches to a commercial seller of a product that inflicts harm on a person because of a defect. *Berrier*, 563 F.3d at 54 (quoting Restatement (Third) of Torts § 1 (1998)). "One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product . . . for harm to persons or property *caused by the defect*." *Id.* (emphasis added). The Restatement (Third) further provides that a product:

> (a) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the

---

issue in *Sansom v. Crown Equipment Corp.*, 2:10-cv-0958, 2012 WL 3027989 (W.D. Pa. July 24, 2012) (applying *Covell*).

omission of the alternative design renders the product not
reasonably safe;

(b) is defective because of inadequate instructions or warnings when
the foreseeable risks of harm posed by the product could have been
reduced or avoided by the provision of reasonable instructions or
warnings by the seller or other distributor, or a predecessor in the
commercial chain of distribution, and the omission of the
instructions or warnings renders the product not reasonably safe.

Restatement (Third) of Torts, § 2 (1998). Any alleged defect must be present at the time of sale

or distribution. *Id.* The Plaintiffs assert that the Defendants are strictly liable because the design

of the 1999 Yamaha G16A golf car, namely the hip restraint, was defective and because the

Defendants failed to provide adequate warnings of the risks involving ejection from the vehicle.

*DESIGN DEFECT UNDER THE RESTATEMENT (THIRD) OF TORTS*

To establish a prima facie case of design defect under the Restatement (Third) of Torts, a

plaintiff must prove the availability of a technologically feasible and practical alternative design

that would have reduced or prevented the harm sustained by the plaintiff.[13] Restatement (Third)

of Torts § 2, cmt. f. The risk of harm must have been foreseeable, and the reasonable alternative

design must be such that its omission renders the product not reasonably safe. *Id.* In other

words, "the test is whether a reasonable alternative design would, at reasonable cost, have

reduced the foreseeable risks of harm posed by the product and, if so, whether the omission of

the alternative design by the seller . . . rendered the product not reasonably safe."[14] *Id.* Of

---

[13] The Restatement (Third) of Torts recognizes that product sellers may be subject to liability even if a reasonable alternative design did not exist at the time of sale. *See* Restatement (Third) of Torts § 2, cmt. e. However, in that instance, a plaintiff must prove that the product design was manifestly unreasonable (i.e., the product had such low social utility coupled with a high degree of danger that the absence of a reasonable alternative design would not obstruct a plaintiff from obtaining relief). Because the Court is satisfied that a jury could conclude that a reasonable alternative design for the hip restraint existed at the time of initial sale of the 1999 Yamaha G16A golf car, it need not examine whether the product was manifestly unreasonable.

[14] This standard is remarkably different than that prescribed under the Restatement (Second) of Torts § 402A. As other courts in this circuit have noted, "[the Restatement (Second)] standard focuses on an intended user making an intended use of the product, [whereas the Restatement (Third)] focuses on the foreseeable risks of harm and whether

course, the plaintiff must prove that the design defect of the product caused the plaintiff's harm. *See* Restatement (Third) of Torts § 1.

The Court concludes that the Plaintiffs have produced sufficient evidence such that a reasonable jury could conclude that when the 1999 Yamaha G16A golf car is turned sharply to the left at or near maximum speed, there is a foreseeable risk of ejection, especially when children (or other small people) ride as passengers. The National Highway Traffic Safety Administration ("NHTSA"), in promulgating its final rule on golf cars, located at 63 FR 33913 and dated June 17, 1998, noted the growing on-road use of golf cars and the severe injuries (including deaths) related to such use. Ex. K to Pls.' Br. Opp'n Mot. Summ. J., ECF No. 43-12. In addition, the report examines crash data from accidents occurring from 1993 to 1997, separating the data by pedestrian injury, off-road injury, on-road injury, on-road fatality, rollover injury, and ejection injury. *Id.* Of the 726 incidents reported to the National Electronic Injury Surveillance System, 94 resulted in injuries caused by ejection. *Id.* According to the Plaintiffs, the NGCMA – an association of which Yamaha is a member – "participated and was aware of the report." Pls.' Br. Opp'n Mot. Summ. J. at 20. Through additional accident data,[15] Mr. Seluga states that ejection from a moving vehicle represented the most common type of golf car accident, with an estimated forty percent (40%) of the total reported accidents resulting in ejection. Seluga Exp. Rep. at 4. According to Seluga's analysis of the data, when accident location was reported, seventy percent (70%) of accidents occur at golf courses (or other similar

---

an alternative design could have minimized or eliminated that risk." *Giehl v. Terex Utilities*, 3:12-0083, 2012 WL 1183719, at *7 (M.D. Pa. April 9, 2012) (quoting *Hoffman v. Paper Converting Mach. Co.*, 694 F. Supp. 2d 359, 365 (E.D. Pa. 2010)).

[15] Defendants' expert, Kevin Breen, maintains that the accident data used by Seluga does not provide significant insight for this case because the data is limited in scope (due to its small sample size) and is not well suited to the generalized scaling-up process used by the data collector because of the seasonal nature and use of golf cars. These arguments go to the weight of the evidence put forward by the Plaintiffs, and, therefore, they are more appropriately made in front of a jury.

sporting or recreational facilities), while the remaining thirty percent (30%) take place at private homes or on public roadways. *Id.* When this data is filtered for children under the age of sixteen (16), Seluga reports that roughly forty percent (40%) of all documented accidents involve this age group, and over half of accidents involving this age group result in ejection from the vehicle. *Id.* at 5. When this data is again filtered for children under sixteen (16) years of age, and where accident location was reported, about half of the accidents occurred on the golf course, on the one hand, and half took place at a private residence or public street, on the other. *Id.* Mr. Seluga further states that information from case narratives highlight the foreseeability of ejection, particularly when children are passengers, upon executing a sharp turn to the left while traveling at or near maximum speed. Seluga Exp. Rep. at 5. Mr. Seluga's previous academic scholarship further suggests that a reasonable jury could conclude that the risk of ejection from a golf car, in fact, was foreseeable. *See* Seluga Exp. Rep. at 7 (citing Kristopher Seluga, Irving Ojalvo, & Richard M. Obert, *Low Speed Vehicle Passenger Ejection Restraint Effectiveness*, J. Accident Analysis & Prevention, 37:4:801-06 (2005)), *see also* ECF No. 45-10.

Plaintiffs have also presented sufficient evidence for a jury to conclude that a reasonable alternative design was available – in other words, technologically feasible and economically practical – at the time of sale and would have prevented the risk of passenger ejection in the 1999 Yamaha G16A golf car. [16] A plaintiff need not produce a prototype of the reasonable alternative design to make out a prima facie case of design defect. Restatement (Third) of Torts § 2, cmt. f. A plaintiff may rely on credible expert testimony that the alternative design could have been practically adopted at the time of sale, even where the expert itself has produced no prototype, if

---

[16] For our purposes in deciding the Motion for Summary Judgment, our inquiry is whether the Plaintiffs have presented sufficient evidence such that a reasonable jury could conclude that a reasonable alternative design could have been practically adopted. Restatement (Third) of Torts § 2, cmt. f.

the testimony and other evidence reasonably supports such a conclusion. *Id.*; *see Hoffman*, 694 F. Supp. 2d at 365-66. If a plaintiff introduces expert testimony to establish that a reasonable alternative design could have been adopted, a trier of fact may conclude that the product was defective notwithstanding that such a design was not adopted by any manufacturer, or ever considered for commercial use, at the time of sale. Restatement (Third) of Torts § 2, cmt. d. Further, despite the fact that Plaintiffs have produced the expert testimony of Mr. Seluga, such evidence is not required in cases where the feasibility of a reasonable alternative design is obvious and understandable to laypersons to support a finding that the product should have been designed differently and more safely. *Id.* at cmt. f. In addition, a plaintiff is not required to establish with particularity the costs and benefits associated with adoption of an alternative design. *Id.*

Plaintiffs, through Mr. Seluga, propose two alternative designs that would have made this golf car safer. One of the designs is a taller hip restraint that, at its highest point, sits nine to ten inches (9-10") above the uncompressed seat cushion.[17] The other alternative design proposed by the Plaintiffs is a centrally-mounted handhold/hip restraint. Both of these designs were, according to Seluga, "technically and economically feasible" at the time of manufacture (and, by implication, at the time of sale). Seluga Exp. Rep. at 15. In fact, Seluga testified that some time before the 1999 Yamaha G16A golf car was made available for sale, Seluga Dep. Tr. 68:9-15, a golf car manufactured by Club Car contained an optional add-on rearward-facing bench seat where golf equipment would otherwise be held, which had a large hip restraint and a centrally-mounted handhold. Seluga Dep. Tr. 69:8 – 70:23. The hip restraint for the rear-facing seat, according to Seluga, was approximately ten or eleven inches (10"-11") above the seat. *Id.* at

---

[17] The actual hip restraint here was approximately five and one-half to six and one-half inches (5 ½" – 6 ½") above the uncompressed seat cushion. Seluga Exp. Rep. at 16.

70:10-11. As a counterpoint to Mr. Seluga's claim that these alternative designs were technologically and economically available, Defendant expert, Mr. Kevin Breen, concluded "to a reasonable degree of scientific certainty" that "the 1999 Yamaha G16A represents a state-of-art design as of the day of manufacture." Breen Exp. Rep. at 10, ECF No. 35-8. Yamaha further argues that the golf car was manufactured in compliance with the standards adopted by the ANSI/NGCMA committee, which appears to be uncontroverted by the record.[18] Defs.' Br. Supp. Mot. Summ. J. at 18; Defs.' Concise Statement of Material Facts ¶ 14; Pls.' Resp. to Defs.' Concise Statement of Facts ¶ 14. Each position appears to have sufficient evidentiary support and they demonstrate that there exists a genuine dispute of material fact that precludes the entry of judgment as a matter of law against Plaintiffs on this point.[19]

The Court also concludes that the Lynns have produced sufficient evidence that would enable a jury to conclude that the omission of the reasonable alternative design renders the golf car not reasonably safe. In considering whether an alternative design is reasonable and whether its omission renders a product not reasonably safe, the Court may consider the following factors: (1) the magnitude and probability of the foreseeable risks of harm; (2) the instructions or

___

[18] The Restatement (Third) of Torts allows a defendant to introduce evidence regarding industry standard that bears on whether the alternative design was practicable at the time of sale and whether the omission of the alternative design renders the product, as sold, not reasonably safe. Restatement (Third) of Torts § 2, cmt. d. An industry standard is admissible evidence of the reasonableness of the product's current design, since such standards make it more probable than not that all possible care was exercised in preparing and marketing the product. *See Sansom*, 2012 WL 3027989, at *8 (quoting *Covell*, 651 F.3d at 366-67).

[19] In any event, the Court is satisfied that the alternative designs for the hip restraint are obvious and understandable to laypersons. Thus, while Seluga's testimony is of apparent assistance to the trier of fact, the jury could conclude, without the benefit of further expert testimony (e.g., testimony of in-house engineers at Yamaha or business experts of other similar golf car manufacturers), that these designs would have been available at the time of sale of the Yamaha golf car in this case. The designs propounded by Seluga would involve similar, if not the exact same, technology, in terms of raw materials and general shape, as the hip restraints actually installed on the Yamaha G16A in 1999. *See* Seluga Exp. Rep. at 28-29. While the summary judgment record is devoid of evidence of the actual cost of either adding a third, centrally-mounted restraint/handhold or extending the passenger-side restraint/handhold upward by three and one-half inches (3 ½"), the Court is satisfied that a jury could conclude that the cost, in terms of extra materials and labor, in implementing such a design would be relatively minimal compared to a design that would implement new technology or significantly alter the existing design.

warnings accompanying the product; (3) the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing;[20] and (4) the relative advantages and disadvantages of the product as designed compared to as it alternatively could have been designed (i.e., the likely effects of the alternative design on production costs, the effects on product longevity, maintenance, repair, and aesthetics, and the range of consumer choice among products). *Id.*, cmt. f. *See also Richetta v. Stanley Fastening Sys., L.P.*, 661 F. Supp. 2d 500, 510 (E.D. Pa. 2009) (applying factors). The overall safety of the alternative design must be considered, for the omission of an alternative design that would have prevented or reduced the harm in one instance but gives rise to other, more serious risks in another would not render the initial product unreasonably dangerous. Restatement (Third) of Torts § 2, cmt. f.

First, in his report, Mr. Seluga concludes that the injuries to Mercedez Lynn from this accident would not have occurred (or would have otherwise been prevented) had the Lynns' golf car been equipped with a higher hip restraint and/or a centrally-mounted handhold device resembling the hip restraint in design. Seluga Exp. Rep. at 14; *see also* ECF No. 45-10. The statistical data analyzed by Mr. Seluga, as we have already discussed above, is evidence which would demonstrate that the risk of ejection was foreseeable. In addition, Seluga's computer simulation shows that the magnitude of the risk is high, given that the head is among the body parts to strike the ground first when a passenger is ejected by engaging the hip restraint. Seluga Dep. Tr. at 146:15-17. The grave nature of Mercedez's claimed injuries, which include a subdural hematoma and traumatic brain injury, supports this conclusion. Compl. ¶¶ 21-22.

---

[20] As to the third point, the summary judgment record lacks evidence of the nature and strength of consumer expectations regarding the Yamaha golf car in question. While the Plaintiffs submit photographs used on the Yamaha website, these do not address the marketing of the 1999 Yamaha G16A specifically.

Second, while the instructions or warnings accompanying the golf car do not specifically warn of the foreseeable risk of ejection, they do explicitly warn that death or serious bodily injury can occur, or, in other words, such harm is foreseeable. As the Court will examine in further detail below, the sticker directly above the vehicle's beverage holder warns that the golf car should be driven slowly in turns, and that occupants should remain seated and hold on when the vehicle is in motion, to avoid death or serious bodily harm. A reasonable jury could conclude that such a warning is not sufficient to overcome the omission of a safer alternative design.[21] *Richetta*, 661 F. Supp. 2d at 511. As the Restatement (Third) instructs, warnings are not a substitute for the provision of a reasonably safe design. Restatement (Third) of Torts §2, cmt. l. However, although they are embedded within a list of ten (10) warnings, these warnings are prominently displayed in the center of the golf car, at a reasonable height for all occupants to notice, and in a location commonly used by occupants to store items.

Finally, the Court concludes that the relative advantages and disadvantages of Mr. Seluga's proposed alternative designs outweigh those of the golf car as designed. As we have already indicated, the likely effects of the alternative designs on production costs would be minimal. Mr. Seluga is not proposing alternative designs that would require enhanced technology or a complete overhaul of the hip restraint. Instead, Mr. Seluga proposes a design of the restraint that differs only in height. While the Court is cognizant of the fact that a higher restraint could impede on a passenger's ability to enter and exit the vehicle with ease, a jury could readily find that such an imposition would be insignificant compared to the increased safety users would enjoy by the alternative design. Thus, the Court concludes that the Lynns

---

[21] The Court would note that it reaches this conclusion based on the narrow issue of whether the alternative design proposed by Seluga is reasonable and whether its omission renders the 1999 Yamaha G16A golf car not reasonably safe. This conclusion is merely a factor in the inquiry required under the Restatement (Third), and it should not be deemed as an adequacy determination of the warning itself.

have produced sufficient evidence that a reasonable jury could conclude that Mr. Seluga's alternative designs are reasonable and the omission of such designs makes the golf not reasonably safe.

### THE INTENDED USE AND INTENDED USER DOCTRINES

The heart of Defendants' summary judgment arguments is that the use of the golf car here was by no measure an "intended use," nor was its operation by Ms. Johnston the operation of or by an "intended user." Defendants contend that under the analysis posited by the Restatement (Second) and by the legal norms applicable post-*Azzarello*, the application of these doctrines (or, in reality, either one of them) shuts the door on Plaintiffs' strict liability claims. For the reasons which follow, the Court finds these contentions unavailing here.

Over forty years ago, the Pennsylvania Supreme Court adopted Section 402A of the Restatement (Second) of Torts.[22] *Azzarello*, 391 A.2d at 1023 (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)). This provision imposed strict liability upon sellers of defective products that are "unreasonably dangerous to the user or consumer." Restatement (Second) of Torts § 402A(1) (1965). *See also Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 538 (3d Cir. 2007).

The *Azzarello* court, concerned that juries would force suppliers to also be insurers of their products in every circumstance, created a framework whereby the initial decision to expose

---

[22] Section 402A of the Restatement (Second) states:

(1)      One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)      The rule stated in Subsection (1) applies although:  (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) Torts § 402A (1965).

a distributor of an allegedly "unreasonably dangerous" product to strict liability rests with the trial judge. *See id.* at 1023-24, 1026-27; *Moyer*, 473 F.3d at 538.  Therefore, under Pennsylvania's interpretation of the Restatement (Second), whether or not a product is "unreasonably dangerous" (so that placing the risk of loss on the supplier would be justified) was a question of law. *See id.* at 1026; *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1044 (3d Cir. 1997).

Pennsylvania law under the Restatement (Second) provided that a product is "unreasonably dangerous" if its unavoidable dangers outweigh its utility, in light of "the availability of precautions that, though not foolproof, might prevent the injury." *See Phillips*, 841 A.2d at 1013-14 (quoting *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 618 (Pa. Super. Ct. 1983)). Consequently, a court, prior to submitting the plaintiff's case to the jury, was to conduct a risk-utility (or cost-benefit) analysis. *Id.*  If the risks of the product outweigh its utility to the public under the facts alleged, then the suit proceeds to the jury, which will determine if (1) the product is defective because it left the distributor's control lacking any element necessary to make it safe for its intended use or possessing a feature that renders it unsafe for such use and (2) the defect caused the plaintiff's injury. *Surace*, 111 F.3d at 1044 (citing *Azzarello*, 391 A.2d at 1027).

The Defendants did not move for summary judgment pursuant to this *Azzarello* analysis.[23]  Instead, they alleged that Plaintiffs' strict liability claims fail as a matter of law

---

[23] While the Defendants bear the burden of establishing that the product is not unreasonably dangerous under the *Azzarello* test, *Warnick*, 512 F. Supp. 2d at 324 (quoting *Surace*, 111 F.3d at 1049 n.10); *Zollars v. Troy-Built, LLC*, Civil Action No. 10-924, 2011 WL 7102573 (W.D. Pa. Dec. 21, 2011) (citing *Bowersfield v. Suzuki Motor Corporation*, 111 F. Supp. 2d 612, 617 (E.D. Pa. 2000)), they have averred that they anticipate that the Court will be asked to conduct the risk-utility analysis based upon evidence at the time of trial and not at the summary judgment stage. *Id.* As the Defendants have not filed for summary judgment based on *Azzarello*, and thus have not addressed whether the golf car as designed was unreasonably dangerous at the time of sale, they have failed to meet their summary judgment evidentiary burden at this stage, and the Court will not engage in the risk-utility analysis that was undertaken in *Sansom*, 2012 WL 3027989, at *9-15.

because the golf car was being used in an unintended manner by unintended users. The Defendants ask the Court to make that determination without conducting any risk-utility analysis under *Azzarello*. *See* Defs.' Supplemental Br. at 7. For the reasons that follow, Yamaha's arguments regarding intended use and intended user fail as a matter of law.

As a preliminary matter, the Court would note that, given its application of the Restatement (Third) of Torts to the case *sub judice*, and given the evolution of the precedent of our Court of Appeals, the district courts within the circuit, and the Supreme Court of Pennsylvania, the legal principles of "intended use" and "intended user" have little bearing on the current state of products liability law in Pennsylvania as this Court is required to apply it. They are issues endemic to a Restatement (Second) analysis. As the *Berrier* court noted, it is difficult, if not impossible, to determine if a product is safe for its "intended use" by its "intended user" without considering foreseeability, a Restatement (Third) concept. *Berrier*, 563 F.3d at 56. In any event, a court has flexibility in determining the intended use of a product in strict liability cases. *See Warnick v. NMC-Wollard, Inc.*, 512 F. Supp. 2d 318, 325 (W.D. Pa. 2007) (quoting *Schindler v. Sofamor, Inc.*, 774 A.2d 765, 773 (Pa. Super. Ct. 2001)). "[T]rial courts are not restricted to considering a single use of a multi-use product . . . ." *Beard*, 41 A.3d at 838. Moreover, the Restatement (Third) of Torts makes no mention of an intended use or an intended user. It does not restrict recovery to only users or consumers; rather, it allows recovery for any person harmed by a defective product. Restatement (Third) of Torts § 1. Given this Court's conclusion that the Restatement (Third) applies to this action, we need not proceed further in an analysis of "intended use" and "intended user" principles. However, given the posture of this case it is appropriate to examine Yamaha's arguments in light of these doctrines and the foreseeability analysis of the Restatement (Third).

The Defendants first argue that they cannot be held liable because the golf car in this case was not being used in its intended manner, as required by applicable law. *See Pennsylvania Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.* ("*DGS*"), 898 A.2d 590, 600 (Pa. 2006) ("[A] manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended users even where foreseeable by a manufacturer."); *see also Phillips v. Cricket Lighters*, 841 A.2d 1000, 1007 (Pa. 2003) (plurality opinion). In advancing this argument, the Defendants point to the definition of "golf car" in the national standard set forth by the ANSI/NGCMA. That definition states that a golf car is "[a] vehicle used to convey a person or persons and equipment to play the game of golf in an area designated as a golf course." Ex. E to Defs.' Br. Supp. Mot. Summ. J., ANSI/NGCMA Z130.1-1993, Part 3.18 at 2.

We are not as constrained as Defendants would desire in determining the intended use of a product in strict liability cases. *See Warnick* 512 F. Supp. 2d at 325 (quoting *Schindler*, 774 A.2d at 773). The *Schindler* court stated that "the intended use of a product is a conclusion of law, to be decided by the trial court . . . [, and] the trial court is not bound by any party's legal conclusions as to the intended purpose of a product, even if those conclusions are couched as averments of fact or presented as expert evidence." *Schindler*, 774 A.2d at 773. In addition, the Pennsylvania Supreme Court recently held that "trial courts are not restricted to considering a single use of a multi-use product . . . ." *Beard*, 41 A.3d at 838.

Limiting the intended use to that proposed by the Defendants – a vehicle that is only used to convey persons on a turf golf course by licensed drivers – would require the Court to "put on blinders," *Beard*, 41 A.3d at 836, to the actual and practical use of this product. Golfers

encounter various types of surfaces when enjoying a round of golf on their local links. Asphalt, concrete, gravel, or other similar roadway-like surfaces can be found in the parking lots adjoining a golf course and the cart paths that line nearly every hole of virtually every public or private course. Furthermore, on the golf course, golfers may encounter the need to make the same U-turn maneuver executed by Jackie Johnston on Sutherland Road. Moreover, as described in further detail above, thirty percent (30%) of golf car accidents (where the location is reported) are asserted to occur at locations other than on the golf course, such as at private homes or on public streets. Seluga Exp. Rep. at 4. Finally, the Defendants have seemingly promoted similar vehicles for use off of the golf course. ECF Nos. 43-4, 43-5, and 43-6. The Court thus concludes that the intended use of the golf car in question is not limited to cut-turf golf course surfaces, but rather is to convey persons from one point to another at a relatively low speed. Further, and critically, it is plain that applying Restatement (Third) principles, a jury could reasonably conclude that such "non-golf course" use as is present here was entirely foreseeable.

Citing to *Phillips*, the Defendants also urge the Court to enter summary judgment against Plaintiffs because Ms. Johnston and Mercedez Lynn were not intended users of the vehicle. In *Phillips*, the trial court's finding that a two-year-old child was not an intended user of a cigarette lighter required that the manufacturer of that product could not be liable in strict liability. *Phillips*, 841 A.2d at 1003-04. On appeal, the Pennsylvania Supreme Court concluded that the trial court properly determined that a strict liability claim could not lie against the manufacturer because the child was not an intended user of the butane cigarette lighter. *Id.* at 1007.

*Phillips* is distinguishable from this case. The *Phillips* court held that the child was not an intended user of the lighter because: (1) the plaintiff did not contest that the butane lighter was intended to be used solely by adults and specifically not by a two-year-old child; and (2) she did

not contend that, as designed, the lighter was unsafe for use by the adult intended user. *Id.* Here, the Lynns do not concede that the golf car was intended to be used solely by adults, and, through Mr. Seluga's testimony, posit that the golf car is defective as to all passengers, including adults. Seluga Dep. Tr. at 44:12 – 45:24. Second, there is no evidence in the record to show that teenagers are unintended users as drivers of the golf car. Yamaha relies on Mr. Seluga's statements that the golf car was not being operated by intended users as conclusive evidence of a legal conclusion to be determined by the Court. Defs.' Br. Supp. Mot. Summ. J. at 11; Defs.' Reply Br. at 7. The Court notes that the warnings actually present on the golf car at the time of the accident simply caution that the vehicle should be operated "only when authorized and only in designated areas." ECF No. 51-30 at 32. This warning does not tell us what kind of authorization is required, nor does it tell the user (or the Court) who can give such authorization, or that the only acceptable "authorization" is a current state-issued driver's license.[24] Here, a reasonable jury could conclude that Jackie Johnston was authorized, at least by implication or acquiescence, by Mr. Lynn to operate the vehicle. Johnston Dep. Tr. at 61:5-17, 113:19-24. It is also obvious to the Court that this case, involving two teenage girls driving a vehicle with a top speed of approximately thirteen (13) miles per hour, varies drastically from the unfortunate facts in *Phillips*. It is difficult to fathom how a two-year old child could under any conceivable set of circumstances be considered an intended user of a butane cigarette lighter. However, there is no difficulty for the Court in concluding that Jackie Johnston was, at minimum, not an unintended

---

[24] The Defendants hang their hat on the potential illegality of Jackie Johnston's operation of the vehicle on Sutherland Road as demonstrative of the unintended use of the vehicle, and thus evidence that Jackie Johnston was an unintended user. However, the Court is satisfied that any such testimony is more properly brought in raising the affirmative defenses of voluntary assumption of risk, product misuse, or highly reckless conduct under *Reott v. Asia-Trend, Inc.*, 7 A.3d 830 (Pa. 2010).

user of the vehicle in this case, and the Court concludes that a jury could find that she was a reasonably foreseeable user.

Third, the Court is hard pressed to hold that Mercedez Lynn was an unintended user as a passenger in the golf car here. Yamaha's own marketing materials depict children as the passengers of its vehicles. *See* Seluga Exp. Rep. at 4 (citing Yamaha's advertising showing youngsters as passengers); ECF No. 43-6. In addition, the data cited by Mr. Seluga states that over 5,000 of the 11,000 reported golf car accidents per year involve children under the age of sixteen (16). Seluga Exp. Rep. at 5. It is certainly within reason that a child will join a parent for a round of golf before he or she becomes a licensed driver, and the Court would note that if it were to extend Defendants' theory on the unintended users of golf cars as applied to Mercedez Lynn to its logical next step, Defendants would be immune from suit brought by a teenaged golfer harmed while riding as a golf car passenger on a golf course with a licensed parent, relative or other temporary guardian at the wheel.

The Court would also note that this extension of the Defendants' argument presents an example of what is perhaps one of the fundamental jurisprudential bases supporting the adoption of Sections 1 and 2 of the Restatement (Third) of Torts. The highly cabined nature of the intended use and intended user doctrines is at odds with the reality of manufacturers, users and courts necessarily taking into account, in their usual and normal daily work, the reasonably foreseeable uses of a product or procedure, and the risks flowing from such uses of manufactured products. One need only consider the facts and holding in *Beard* as to the multiple intended uses of a product to reach that conclusion.

Reliance on narrow definitions of "intended uses" and "intended users" in the face of reasonably foreseeable, or even obviously foreseeable, other uses by other users will too often

lead to the necessity for judicial engrafting of concepts such as "multiple" intended uses onto these labels in order to avoid results wholly at odds with the "defective product" principles underlying longstanding strict liability law.   The application of the concept of "reasonable foreseeability" central to the Restatement (Third), has the dual advantages of invoking an analytical principle long applied in tort law, thereby providing a greater degree of predictability to the legal process, and at the same time, holding true to the foundational principles of product liability law as to when a manufacturer will, and will not, be held accountable for harm caused by a defective product.   In short, rather than the focal point being whether a given plaintiff, or given conduct, fits within a tightly-defined classification, the focus is instead on whether the circumstances are such that a manufacturer should be held to account for harm resulting from a product defect because such harm was, in the circumstances, reasonably foreseeable.[25]

Further, Pennsylvania courts and courts within our circuit have navigated the foggy channels of Pennsylvania products liability and have allowed recovery for seemingly unintended users even before the Third Circuit's holding in *Berrier*. *Berrier*, 563 F.3d at 56 n.27, 58.   Also, often there will not be a single, true "intended" use of a product, nor will there usually be a specifically limited group of "users" and an accompanying class of persons that can be conclusively defined as being outside the sweep of "intended" users.   The *Beard* opinion

---

[25] An examination of the various opinions in *DGS*, 898 A. 2d 590 (Pa. 2006) reveals the analytical twists and turns inherent in a judicial focus, *vel non*, on whether a particular use, by a particular user, is "intended." In that case, there was a fundamental disagreement among the six (6) participating Justices as to whether the "use" and "user" in that case were "intended." In many ways, the formulation of the Restatement (Third), focusing instead on "foreseeable risks of harm" restores the underlying premise of strict liability principles – manufacturer liability for harm caused by defective products based on the condition of the product itself. Instead, we now have the question framed by the definition of the use and user and whose definition of "intention" should apply. If for no other reason, the predictability resulting from the application of a concept long utilized in tort law, e.g. foreseeable harm, would seem to have much to commend it. Avoiding a rigid focus on what label to attach to a given use, or user, minimizes, or perhaps even eliminates, the need for "limited, targeted exceptions," *DGS*, 898 A.2d at 601, n.10, or for the necessarily *ad hoc* judicial determinations as to multiple intended uses. *Beard*, 41 A.3d at 836-37. To borrow from the rubric of the *Beard* court, all too often a failure to consider the "foreseeable" risks of harm from a defective product will, in fact, require trial courts, and the various participants in the stream of commerce, to "put on blinders" to the reality of a product's real-world foreseeable uses and users. *Beard*, 41 A.3d at 836.

demonstrates the reality of court-determined multiple legitimate uses of a product based on its actual, foreseeable application in everyday activities, *Beard*, 41 A.3d at 838, and, as our Court of Appeals noted in *Berrier*, the concept of reasonable foreseeability as to likely actual users is a far more accurate measuring stick for when liability may properly attach for harm caused by a defective product.  *Berrier*, 563 F.3d at 60.  The facts of record here demonstrate that a reasonable jury could conclude that the use, and users, of the golf car here were in fact reasonably foreseeable, and that in any event, apart from the concept of foreseeability, this use, and these users, cannot as a matter of law be excluded from consideration as being an unintended use by unintended users so as to preclude recovery in strict liability.

*CAUSATION – DESIGN DEFECT*

While the question of causation in Pennsylvania is normally for the jury, "if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law." *Conti v. Ford Motor Co.,* 743 F.2d 195, 197-98 (3d Cir. 1984).  In the instant matter, as we examine in further detail below, genuine issues of material fact exist with respect to causation, namely the positioning of Mercedez Lynn in the Yamaha golf car during Ms. Johnston's execution of the U-turn on Sutherland Road.[26]

The Restatement (Second) and Restatement (Third) of Torts both require that the Plaintiffs prove that the defective hip restraint on the 1999 Yamaha G16A caused the harm sustained by Mercedez in order for strict liability to apply.  *See Berkebile*, 337 A.2d at 898; Restatement (Third) of Torts § 1.  To prove causation, specifically proximate causation, as

---

[26] This determination does not change the Court's analysis regarding Mr. Seluga's computer simulation wherein Mercedez Lynn is seated in the upright position, with her feet on the floor and back against the seatback, since that data entry is supported, and not contradicted, by the deposition testimony of Jackie Johnston.

required under *Wilsom v. Vermont Castings, Inc.*, 170 F.3d 391, 396 (3d Cir. 1999), the Plaintiffs

must prove that the defective hip restraint "was a substantial factor in causing the injury."

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 148 (3d Cir. 1998). While evidence of a plaintiff's

negligent conduct is ordinarily irrelevant to the question of whether the defective product

contributed to the harm sustained, *see Jara v. Rexworks, Inc.*, 718 A.2d 788, 793-94 (Pa. Super.

Ct. 1998), the plaintiff's actions can be used to analyze causation[27] where the defense offers

evidence to show that the accident occurred solely because of the plaintiff's conduct. *See*

*Fralish v. A.O. Smith Corp.*, No. 1333 MDA 2002, 2004 WL 1587559, at \*8 (Pa. Super. Ct. July

7, 2004).

The Court concludes that there is a genuine issue of material fact with respect to

causation that warrants the denial of Defendants' summary judgment motion. The Plaintiffs

have presented evidence to support their theory of causation that Mercedez Lynn, seated in the

golf car, was ejected because the hip restraint acted as a fulcrum (instead of acting as a passive

restraint) when she engaged it in the middle of the left-handed U-turn. Jackie Johnston testified

that, just before entering the driveway to execute the U-turn, she saw Mercedez with her feet on

the floor and in the seated position. Johnston Dep. Tr. at 71:2-3.

Defendants argue that there is *no* evidence from which a reasonable jury, let alone an

expert witness,[28] could conclude that Mercedez engaged the hip restraint during her fall from the

golf car. For example, the Defendants note that no one saw Mercedez actually leave the

passenger compartment of the vehicle, including Jackie Johnston. Furthermore, it is undisputed

---

[27] A plaintiff's conduct is also relevant to the issue of causation when considering the affirmative defenses of voluntary assumption of risk, product misuse, and highly reckless conduct. *See Reott*, 7 A.3d at 836 (Pa. 2010).

[28] The Defendants allege in their Motion to Preclude the Testimony of Kristopher Seluga, M.S., P.E., styled in terms of a *Daubert* motion, that Seluga's testimony should be excluded because it is unreliable and fails to fit the facts of this case. As already set forth in greater detail above, the Court disagrees.

that Mercedez does not remember the events immediately leading up to and including the accident. Defendants therefore argue that Mercedez could have been seated in a number of different positions each of which would have affected her exit trajectory from the golf car. Defendants also point out that Mercedez was typing and/or sending text messages, which required the use of both of her hands, during the time leading up to the accident. Thus, according to the Defendants, Mercedez would not have been ejected had she been able to brace herself properly within the turn in compliance with the beverage-holder warning, and would not therefore have been using a central handhold, if it existed.

However, Plaintiffs' expert, Mr. Seluga, testified that, while it is certainly possible that Mercedez left the vehicle in some other fashion (e.g., through the opening in front of the hip restraint), given the facts available to him at the time of his investigation and testing – such as the Johnston deposition transcript, police reports, and the various measurements related to the accident (including speed, turning radius, and surface slope) – it is highly likely that Mercedez exited the golf car via a path over the hip restraint. This conclusion, according to Seluga, is buttressed by the physical location of Mercedez on the surface of Sutherland Road, because she otherwise would not have landed in the same spot within the turn had she exited the vehicle some other way. These assertions, coupled with the contrary arguments advanced by the Defendants require the Court to find that there is a genuine issue of material fact as to all of the elements of causation, making summary judgment improper. These matters must, therefore, be submitted to the jury for consideration.

*FAILURE TO WARN UNDER THE RESTATEMENT (THIRD) OF TORTS*

Sellers of commercial products are required to provide reasonable instructions and warnings about the foreseeable risks of injury posed by their products.[29]  Restatement (Third) of Torts § 2, cmt. i.  Under a failure-to-warn theory of strict liability, a plaintiff must prove that adequate instructions or warnings were not provided and the omission of such warnings, which could have reduced or avoided the foreseeable risks of harm posed by the product, not only renders the product not reasonably safe but caused the plaintiff's harm.  *See* Restatement (Third) of Torts §§ 1-2; §2, cmt. i.  The test is one of reasonableness for judging the adequacy of product instructions and warnings.  *Id.*  In making such an assessment, courts "[m]ust focus on various factors, such as content and comprehensibility, intensity of expression, and the characteristics of expected user groups.  *Id.*  It is impossible to identify anything approaching a perfect level of detail that should be communicated in product disclosures, and warnings or instructions can rarely communicate all potentially relevant information.  *Id.*

The Plaintiffs claim that Defendants' purported warnings about the operation of the golf car were insufficient "in all respects."  Pls.' Br. Opp'n Mot. Summ. J. at 19.  The Lynns claim that:  (1) the text of the Operating Instructions merely informed golf car drivers that the vehicle did not comply with federal motor vehicle safety standards applicable to passenger cars rather than warning that operating the vehicle on a public road could be dangerous; and (2) that the Operating Instructions failed to warn occupants of the risk that a passenger could be ejected

---

[29] Commercial product sellers are generally not liable for failing to warn or instruct about obvious risks generally known by foreseeable users.  Restatement (Third) of Torts § 2, cmt. j.  Warnings about such risks may be ignored and may dilute the effectiveness of other warnings about non-obvious risks.  *Id.*  The Defendants argue that the risk of ejection when "not paying attention and not properly holding on" is common knowledge.  Defs.' Mot. for Summ. J. at 27.  The Plaintiffs counter that the danger of ejection was not "obvious or foreseeable" to them.  Pls.' Br.. Opp'n. Mot. Summ. J. at 11.  When reasonable minds may differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact.  Restatement (Third) of Torts § 2, cmt. j.

during a turn. Pls.' Br. Opp'n Mot. Summ. J. at 8-10, 19. As we explain below, these arguments miss the mark.

There is no dispute that the Owner's/Operator's Manual did not accompany the golf car when it came into the Lynns' possession. Defs.' Concise Statement of Material Facts ¶ 8; Pls.' Resp. Statement to Defs.' Concise Statement of Material Facts ¶ 8. It is also undisputed that the label titled "Operating Instructions" was not permanently affixed to the golf car's steering wheel in accordance with the ANSI standards at the time of the accident. Defs.' Br. Supp. Mot. Summ. J. at 8; Pls.' Resp. to Defs.' Concise Statement of Material Facts ¶ 14; *see also* ECF No. 51-30 at 36. Plaintiffs also argue that no warnings were on the golf car. Pls.' Br. Opp'n Mot. Summ. J. at 7. This assertion, however, is not accurate. The record is clear. At the time of the accident, the golf car contained explicit warnings that touch on the risks involved here. *See* ECF No. 51-30 at 32, 33. The sticker labeled "⚠ **WARNING**" – which was affixed directly below the cup holder in the vehicle's center console and was facing the occupants – expressly states, in capital letters, that "DEATH OR SEVERE PERSONAL INJURY CAN RESULT FROM FAILURE TO FOLLOW THESE INSTRUCTIONS." *Id.* The instructions that follow this preamble caution the driver to, among other things, "[d]rive slowly in turns" and caution the occupants to "[r]emain seated and hold on when in motion." *Id.*

The Court does not believe that a reasonable jury could conclude, based on the record evidence presented, that the golf car was defective because of inadequate instructions or warnings. In a strict liability case alleging such a defect, the plaintiff must show, "through experts or otherwise *why* the warnings are allegedly inadequate or *how* the existing warnings could be improved. *Hoffman*, 694 F. Supp. 2d at 367 (emphasis added). Despite the fact that Seluga observed that "[w]arnings against turning at high speed alone are insufficient," Seluga

44

Exp. Rep. at 8, in support of the need for the alternative designs he proposes, Plaintiffs do not put forth any other evidence in support of their failure-to-warn claim, and neither Seluga (a design expert) nor any other expert (e.g., warnings expert) testified about the adequacy of the golf car's warnings. In accordance with Third Circuit precedent that "the non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record," *SEPTA*, 479 F.3d at 238, to survive summary judgment, based on the record before the Court, Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' strict liability claims for failure to warn. Warnings directly addressing the consequences of not driving slowly in turns, or riding in the golf car other than in a seated position without holding on, were prominent and in place. The golf car was not "defective" as a result of a failure to warn, although it might be defective, as noted above, based on its design.

The Court notes that the Plaintiffs also fail to bring any evidence that more or modified information would have prevented Mercedez from riding, or Mr. and Mrs. Lynn from allowing Mercedez to ride while Jackie was driving, the golf car in the same manner on April 30, 2008. To establish causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller.[30] *See Hartsock v. Wal-Mart Stores East, Inc.*, Civil No. 07-3200, 2009 WL 4268453, at *2 (E.D. Pa. Nov. 23, 2009); *Sherk v. Daisy-Heddon*, 450 A.2d 615, 617, 619-20 (1982). To reach a jury on a failure to warn theory of liability, the evidence must be such as to support a reasonable inference, rather than a guess, that

---

[30] Previous failure-to-warn cases applying the Restatement (Second) of Torts § 402A noted that, as a logical corollary to comment j of §402A of the Restatement (Second), plaintiffs had the benefit of a rebuttable presumption that when no warning (or an inadequate warning) is provided, the user would have read and heeded an adequate warning had one been given by the manufacturer. *See Pavlik v. Lane Ltd./Tobacco Exporters Intern.*, 135 F.3d 876, 881-83 (3d. Cir. 1998). Given our application of Sections 1 and 2 of the Restatement (Third) of Torts, and the lack of any such presumption in its text or commentary, the Court makes no ruling on the applicability of the presumption to the facts of this case neither extinguishing nor extending that legal principle.

the existence of an adequate warning might have prevented the injury. *See Conti*, 743 F.2d at 198.

Plaintiffs point to no evidence that supports any theory of causation that connects inadequate warnings, if any, to Mercedez's injuries. As noted, there was a clear, direct warning present on the golf car. Additionally, Plaintiffs fail to show how the foreseeable risks of harm posed by the golf car could have been reduced or avoided by the adoption and use of other reasonable instructions or warnings (whatever those might be, since Plaintiffs do not propose any substitute warnings). While the warning label on the vehicle's cup holder explicitly warns that death or severe personal injury could result if the vehicle is not driven slowly in turns or if the passenger does not hold on while the golf car is moving, the depositions of record in this case are silent with respect to any actual or hypothetical alternative warnings, specifically regarding how the provision of other or more robust warnings may have changed the users' behavior, and thus would have reduced or prevented the accident. Furthermore, Mr. Seluga does not testify about either the adequacy of the warnings actually displayed on the golf car in question or the causal connection between the warnings and Mercedez's injuries. The Plaintiffs thus have not provided any evidence upon which a jury could conclude that the golf car's lack of a more "adequate" warning caused the harm alleged here.

*FAILURE TO WARN UNDER THE RESTATEMENT (SECOND) OF TORTS*

If the Restatement (Second) Torts were applied to this claim, the result is the same. A plaintiff in a failure-to-warn products liability claim under the Restatement (Second) of Torts must establish: (1) that the product was defective; (2) that the defect was the proximate cause of the plaintiff's injuries; and (3) that the defect causing the injury existed at the time the product left the seller's hands. *Berkebile*, 337 A.2d at 899. The initial determination of whether a

46

warning is adequate is a question of law in Pennsylvania that may be resolved on summary judgment. *See Phillips v. A-Best Prods. Co.*, 665 A.2d 1167, 1170 (Pa. 1995); *Nowak v. Faberge USA, Inc.*, 32 F.3d 755, 757 (3d Cir. 1994). To establish that the product was defective for purposes of bringing a failure-to-warn claim, the plaintiff must demonstrate that a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in the warning made the product "unreasonably dangerous." *Walton v. Avco Corp.*, 610 A.2d 454, 458 (Pa. 1992). The sole question here is "whether the seller accompanied his product with sufficient instructions and warnings so as to make his product safe." *Berkebile*, 337 A.2d at 902. Unlike the Restatement (Third), in this analysis, the Court need not consider the reasonableness of the warnings in light of the foreseeable risks of harm. *Id.*

The Court concludes that, as a matter of law, a reasonable jury could not find that the warnings on the 1999 Yamaha G16A golf car in question were inadequate so as to make the golf car defective. As indicated above, the Lynns make no demonstration beyond the pleadings that the golf car's warnings were either inadequate or altogether lacking. The Court takes note that the beverage-holder warning contains clear, explicit warnings that put a golf car driver, passenger, or owner on notice that death or severe personal injury can result from failure to follow the instructions, which include the need to drive slowly in turns and to remain seated and hold on when the vehicle is in motion. These warnings are concise, to the point, and written in plain English such that teenagers like Jackie Johnston and Mercedez Lynn (and Ms. Lynn's parents) would be able to observe and follow them.

POST-SALE DUTY TO WARN

Plaintiffs also argue that the Defendants violated their post-sale duty to warn of the risk of ejection in the 1999 Yamaha G16A golf car. Pls.' Br. Opp'n Mot. Summ. J. at 20. Where a product was defective at the time of sale and a manufacturer or commercial seller came upon subsequent actual knowledge of the defect, the manufacturer or commercial seller is thereafter required to warn its customers of such a defect. *See Walton*, 610 A.2d at 459-60.

In *Walton*, Hughes Helicopter, Inc. ("Hughes"), a helicopter manufacturer, incorporated as a component part of its helicopter an engine manufactured by Avco Corporation ("Avco"). After an investigation of a Hughes helicopter crash caused by a seized engine, it was discovered that the Avco engine had a failed oil pump. Avco knew about the defective oil pump and communicated this information, which included material about the specific problem that caused the crash in question, to Hughes through periodic service bulletins. Avco recommended that its engines be modified during an overhaul following a particular service bulletin, but Hughes made no such modification to the plaintiffs' choppers. The *Walton* court held that Hughes was strictly liable, albeit after the sale of the helicopter, for failure to warn the owners of the helicopter or the authorized service centers of the defect or the solution that was recommended by Avco. Here, the Lynns generally allege that Yamaha knew that there were problems with ejection from golf cars through its participation with the NCGMA in the NHTSA report on golf car safety. Pls.' Br. Opp'n Mot. Summ. J. at 20. However, the Plaintiffs bring forward no record evidence, in the form of deposition testimony or documentary evidence, to suggest that the Defendants had actual, concrete, and undisputed knowledge of ejections generally, or that the defective hip restraint failed to keep passengers within the golf car specifically, sufficient to survive summary

judgment.[31]  Thus, summary judgment is granted as to the Lynns' claim that Yamaha breached

any post-sale duty to warn of ejections in the 1999 Yamaha G16A golf car.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motion to Preclude the Testimony of

Kristopher Seluga, M.S., P.E., Pursuant to Rule 702 is DENIED.  The Defendants' Motion for

Summary Judgment is GRANTED in part and DENIED in part.  Plaintiffs' defective design

claims based on defective design will proceed to trial.  As to their claims based on alleged failure

to provide adequate warnings, or to provide a post-sale warning, summary judgment will be

granted, and those claims arising in the Complaint are dismissed with prejudice.  The Court

defers ruling on the continued viability of Plaintiffs negligence claims, pending disposition of

their recent Motion seeking the application of the Restatement (Second) of Torts based on the

application of the doctrine of judicial estoppel.

An appropriate order will issue.

Mark R. Hornak
United States District Judge

Filed:  August 16, 2012

cc:    All Counsel of Record

---

[31] The *Walton* court also noted that the unique nature of the helicopter industry supported the imposition of the responsibility of warning customers of defects post-sale. *Walton*, 610 A.2d at 459 ("By their nature [helicopters] are not the types of objects that could get swept away in the currents of commerce, becoming impossible to track or difficult to locate.").  Because the Lynns bring forward no evidence regarding Yamaha's knowledge of the defect presented in this case, the Court need not delve into the propriety of imposing such a post-sale liability on Yamaha to warn secondhand purchasers of any defective golf cars.